IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERT D. MILLER,

                        Plaintiff,                    Case No. 3:08 CV 364

    -vs-

                                                           MEMORANDUM OPINION

JUNG KIM et al.,

                        Defendant.

KATZ, J.

This matter is before the Court on Defendants' Motions for Summary Judgment (Docs. 59 and 61), Plaintiff's Oppositions (Docs. 60 and 65), and Defendants' Replies (Docs. 62 and 66).

The Court notes federal question jurisdiction under 28 U.S.C. §1331 and proper venue under 28 U.S.C. §1391. For the reasons stated below, Defendants' motions will be granted.

## I. BACKGROUND

From June 2006 until the end of May 2007, while a prisoner at the Allen Correctional Institution, Robert Miller ("Miller") was prescribed lithium as part of the cocktail of drugs used to treat his severe depression. Immediately after he was taken off it, Miller was taken to the hospital for treatment of a toxic level of lithium in his blood. Miller blamed three doctors at the prison for the buildup of lithium in his blood: Dr. Judith Box ("Dr. Box"), his outpatient treating psychiatrist; Dr. Ashwin Amin ("Dr. Amin"), one of his non-psychiatric outpatient doctors; and Dr. Jung Kim ("Dr. Kim," collectively "Defendants"), the psychiatrist at the Residential Treatment Unit ("RTU"). The RTU is used for inmates currently experiencing severe mental problems. Miller stayed at the RTU several times and at least twice received psychiatric care from Dr. Kim outside of the RTU when no outpatient psychiatrist was available.

On one such occasion, Dr. Kim decided to add lithium to Miller's psychiatric medications because Miller's depression was insufficiently controlled. In December 2006, Miller was admitted to the RTU. He left in February or March of the next year, returning to Dr. Box's care.[1]

Because lithium can become toxic in blood concentrations near therapeutic levels, patients on lithium require regular blood tests. Defendants stated that the standard testing schedule is every six months. Miller has presented no contrary medical evidence (though he has speculated that a patient receiving simultaneous treatment for diabetes, like him, may warrant closer monitoring). Miller's blood was tested three times. Shortly after starting treatment and six months later, on December 1, 2006, his results were well within the therapeutic range.

Toward the end or December, while Miller was in the RTU, Dr. Kim increased the dose of lithium. Miller's blood test results shortly after the change (December 28, 2006) were close to the high end of the therapeutic range, but not at the edge. All parties agree that Miller began experiencing hand tremors at this point. Dr. Kim states that he returned Miller to his original dose and that the hand tremors went away. Miller states that he does not recall the reversion of his dose and that his tremors persisted until his hospitalization.

Further, Miller states that not only did his tremors increase, but he began experiencing further symptoms. He only claims to have mentioned these symptoms to any of the three Defendants once, but claims that, at least the tremors, were visibly obvious. He claims that some time after his release from the RTU, and before his hospitalization, he told Dr. Box that he was experiencing "shakes and sweats." He states that she responded that those were side effects of lithium. Other than this one conversation, Miller denies mentioning any other symptom to any

---

[1] Miller makes unclear claims about his release from the RTU, but the issue is immaterial.

Defendant. He generally claims to have experienced other symptoms as well, but does not describe how these, rather than the tremors and sweats, would have been obvious to Defendants, especially since some of the other symptoms are necessarily intermittent. No medical report corroborates Miller's claims and even those not prepared by the Defendants indicate no problems, even though Miller claims to have discussed his condition with several nurses.

On May 31, 2007, a nurse informed Dr. Kim, because no outpatient psychiatrist was available, that Miller was experiencing extreme symptoms. Recognizing the symptoms, notably severe confusion and vomiting, as those of lithium toxicity, Dr. Kim ordered the lithium discontinued. When Miller did not improve, he was sent to outside hospitals.[2] Before his condition was treated with dialysis, Miller's blood lithium tested at or near twice the maximum therapeutic level.

Miller's hospitalization occurred shortly before he would have been due for a regular test of the lithium concentration in his blood. Though Miller claims that the lithium concentration in his blood must have built up slowly over time, he has presented no medical evidence contrary to Defendants' statements that lithium concentration can build very rapidly if a patient becomes dehydrated. Further, Miller never stated that he did not become dehydrated at the end of May 2007.

Miller sued Defendants under 42 U.S.C. §1983 alleging violation of his Eighth Amendment rights due to deliberate medical indifference. Though he filed the suit *pro se* (and *in*

---

[2] Miller disagrees with the Defendants and the medical records with regard to the dates of his stays at these outside hospitals, but the disagreement is immaterial.

*forma pauperis*), Miller later retained counsel. Miller died during the course of litigation and his case was taken up by the current plaintiff, the administrator of his estate.

## II. STANDARDS

*A. Summary Judgment*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56©). The Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)). The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also*

*Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir. 2006); *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071; *Bultema v. United States*, 359 F.3d 379, 382 (6th Cir. 2004) . The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

*B. Deliberate Indifference*

Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment giving rise to a claim under 42 U.S.C. §1983. *Estelle v. Gamble*, 429 U.S. 285, 291 (1976) (citation omitted). Such a claim has both an objective and a subjective component.

*Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). The objective component, a "sufficiently serious medical need," can be shown through medical records or by showing that the need for medical attention would be sufficiently obvious to a layman. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 896-97 (6th Cir. 2004). The subjective component is comparable to criminal recklessness. *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994). It requires a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### III. ANALYSIS

As an initial matter, Plaintiff only directs his claim of medical deliberate indifference to the month leading up to May 31, 2007 and not anything after. If he did, any such claim would obviously fail due to the attention he acknowledges he received.

Miller's only attempt to prove the subjective element of deliberate indifference is to rely on the obviousness of his condition. In other words, his assertion is that between his appearance and the few complaints he made, the Defendants were not only presented with sufficient facts to infer that Miller was in danger, but that the signs were so obvious that they must have drawn the inference that he was in danger. Miller could establish the drawn inference portion on a strong showing that the danger he faced was obvious. *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)).

The only medical evidence Miller presents regarding lithium or lithium toxicity is a brief description of the symptoms of lithium toxicity. He never describes how these symptoms are distinguished from the side effects of non-toxic/therapeutic levels of lithium. He never describes

the course or onset of symptoms. In fact, he only presents his lay opinion of obviousness, ignoring the possibility that a medical professional might see an obvious symptom and note that it actually relates to something which is not dangerous. If such a judgment was possible, and Miller's dearth of medical evidence in the face of the opinions of his three treating doctors[3] allows that it was, the incorrectness of such judgment could be medical malpractice but fails to show either sufficient facts to demonstrate danger to Miller or that any of the Defendants drew the inference that he was in danger. In other words, Miller's doctors might have made an incorrect or even negligent medical determination, but medical malpractice falls below the requirement for deliberate indifference. *Estelle*, 429 U.S. at 106; *see also Farmer*, 511 U.S. at 844 ("that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent" does not demonstrate deliberate indifference).

 Miller attempts to save his claim by invoking the insufficiency of failing to verify suspected underlying facts as a counter to obviousness. *Farmer*, 511 U.S. at 842. However, he fails to show that any Defendant suspected a toxic, rather than therapeutic level of lithium in his blood (or even why they must have suspected such) so their failure to verify something they did not suspect, let alone strongly suspect, does not mean that Defendants were deliberately indifferent.

 In addition, Miller suggests that the regular testing of the concentration of lithium in his blood should have been more frequent. He presents no medical opinion for this proposition. Further, he does not note how, even if he had a doctor saying that a different testing schedule

---

[3] This includes Miller's own reference to Dr. Box's statement that his symptoms were mere side effects.

7

might be a good idea, such an opinion could demonstrate more than mere negligence or malpractice. Thus, his disagreement over his testing schedule does not rise to the level of deliberate indifference. *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc) (plaintiff must present evidence that not only is the suggested alternative better, but that the defendants knew that at the time).

Finally, Drs. Kim and Amin also raise the defense of qualified immunity, but because Miller cannot establish a violation of his constitutional rights, any further discussion is unnecessary. *See Pearson v. Callahan*, 555 U.S. 223 (2009).

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment (Docs. 59 and 61) are hereby granted. Case closed.

For the reasons set forth above, the court certifies, pursuant to 28 U.S.C. §1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis on which to issue a certificate of appealability. 28 U.S.C. §2253; Fed.R.App.P. 22(b).

IT IS SO ORDERED.

   s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE